UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JON C. JOLIVETTE, )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>CRYSTAL FLASH PETROLEUM )<br>CORPORATION, )<br>)<br>    Defendant. ) | CASE NO. 1:06-cv-0408-DFH-WTL |

ENTRY ON DEFENDANT'S SUMMARY JUDGMENT MOTION

Plaintiff Jon Jolivette worked for defendant Crystal Flash Petroleum Corporation for more than ten years before he was fired in January 2005. Jolivette claims he was demoted and then fired because he complained of age discrimination, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(d).[1]  Crystal Flash argues that it was trimming its costs during a time when its retail division was suffering, and that Jolivette, who was vice president of retail before being demoted, had not been performing up to expectations. For the reasons discussed in this entry, the undisputed facts show that Crystal Flash is entitled to summary judgment.

---

[1] Plaintiff originally pled a claim of age discrimination in addition to his claims of retaliatory demotion and termination under the ADEA. In response to the summary judgment motion, he has withdrawn the age discrimination claim.

*Undisputed Facts*

The following facts are either undisputed or reflect the evidence in the light reasonably most favorable to plaintiff. Jon Jolivette began working as a merchandise manager for Crystal Flash in 1994 at age 45. He progressed well through the retail side of the company, which sells petroleum products and convenience items, snacks, and fast food at its filling stations. Sometime near the end of 1999 or beginning of 2000, Jolivette was named vice president of the retail division, reporting directly to president John Madden. Madden reported to chief executive officer Mac Fehsenfeld.

Steve Hood served as the field operations manager in retail. He was listed directly below Jolivette on the Crystal Flash management chart. Madden hired Hood in 2002. Hood and Jolivette did not get along well. Jolivette felt that Madden was showing Hood undue favoritism and that Hood was gunning for his job. Jolivette overheard Hood make comments to the effect that he felt Jolivette was incompetent. Jolivette says that at various times it was his responsibility to develop store layouts, to administer rebate programs with vendors, and to come up with new concepts for marketing the refreshments, dry goods, and lottery tickets sold at the convenience stores. In January 2004 a management memo listed those and other duties under his name and listed Steve Hood as accountable for operations, customer service, pricing, and store profitability. Jolivette says he believed from that time on that overseeing the profitability of the retail convenience stores was Hood's province and that he no longer shared any

such responsibility, despite the fact that he was still the vice president in charge of the retail division.

The year 2004 was a tough one at Crystal Flash. Retail profits were down, and the company was continuing a cost trimming phase, resulting in the elimination of a number of positions, including Jolivette's assistant. Madden had been losing confidence in Jolivette and began expressing his concerns directly to Jolivette more readily as the year went on. Delay with one project in particular, obtaining a better looking disposable coffee cup for the convenience stores, aggravated Madden significantly. In a meeting with Jolivette in August 2004, Madden expressed concern with the retail section's performance, Jolivette's level of involvement in general, and his inability to accomplish the coffee cup switch in particular. Madden sent a critical email to Jolivette during the first week of October complaining again that the coffee cup project remained incomplete and stating that Jolivette had one last chance to contact his vendor about executing the requested new design before Madden yanked the project and gave it to someone else to complete.

Jolivette began having doubts about his continued good standing at Crystal Flash. In a chance discussion on Friday, November 5, 2004, Jolivette told payroll manager Ruby Muncy that he was afraid of losing his job as a result of Steve Hood's favored status with Madden and Hood's efforts to discredit him. Jolivette told Muncy that he did not think he could go to Madden or Fehsenfeld with his

concerns. Jolivette made no mention of age discrimination when talking with Muncy.

Near the same time that Jolivette spoke with Muncy, Jolivette approached human resources director Kathy Marra-Wert and began describing to her the problems between him and Hood and how he perceived Hood as having won over Madden with his efforts to discredit Jolivette. Marra-Wert told Jolivette she would look into his concerns if he put them in writing and sent them to her via email. During the morning of Monday, November 8, 2004, Muncy told Marra-Wert about her conversation with Jolivette and his concern that Hood was harming his reputation. Later that day, Marra-Wert received the email she had requested from Jolivette the previous Friday. Because the email includes the lone reference to age discrimination in this record before Jolivette's termination, the substantive portion of that lengthy email is set forth below:

> It is only after much thought and with no other apparent recourse that I must report an ongoing workplace harassment by Steve Hood towards me. This entire year derogatory comments have been made by him about me to vendors and store personnel. These comments have been age discriminatory, created a hostile work environment, impeded my ability to properly do my job, humiliating me and compromising my position with store personnel and vendors and are damaging my business reputation. Several recent incidents occurred on Thursday October 21, 2004 and Friday October 22, 2004. I overheard a conversation between Chuck Dearing of Louis Trauth Dairy (not a current Crystal Flash vendor) and Steve Hood. The portion I heard went as follows: "There is a guy you need to start with his name is Jon Jolivette, Jon Jolivette (repeated). He goes by J.J. He is not here – try him later maybe tomorrow. He is sort of the front guy – gets the details but I finalize everything I report direct to the President. Let me give you a little heads-up on J.J. – between you and I and the fence post He's been here a long time and set in his ways and does not like to make changes. We need to make some changes probably starting with him but

he is still here for now.  He has Prairie Farms in the stores.  We need to throw them out – lots of service issues.  He lets their guys do the ordering — always screwed-up in most of the stores.  We don't have what we need.  Start with him but call me back and let me know what he said.  If he gives you problems or won't give you a fair shot I will go to the President.  Document what he says then call me back.  Okay, call me back after you meet with him"  Chuck Dearing has since called me for an appointment.  On Friday October 22, 2004 in a phone conversation on other matters with Don Minear at store #66 he volunteered the following comments:  "J.J. are you familiar with a vendor Continental Novelty?  I said no.  Its one of those that Steve Hood is working with and he does not want you to know about.  I don't understand all this – you are the Marketing Director.  I don't want to make you mad but Steve Hood says he does not have to get your approval on anything and he reports direct to John Madden and cares less for what you say."

I have had other vendor related problems stemming from actions by Steve Hood.  The latest occurred November 1, 2004 when I received an e-mail from a sales representative concerning problems with Steve Hood.  He is requesting a meeting to discuss the situation.  He related that he could not believe the language that Steve Hood used with him and he wanted something done about it.  He feels Steve Hood is threatening his livelihood by his actions to bar him from the stores and other false accusations.  I have to interrupt my work time and schedule to deal with these continuing issues.  The vendors have reported derogatory comments about me from Steve Hood as well as changes in programs that I had negotiated with them.  Some of these vendor programs involved substantial vendor rebate money to Crystal Flash that was put in jeopardy.  Some of the vendors involved were Lorillard Tobacco Co., Mirage Products Inc., Tri-State Inc.  I can provide the names of people with these companies that called and e-mailed with complaints about Steve Hood that I had to take my time to investigate and straighten-out.  Mirage Products actually stopped selling Crystal Flash until I could assure them Steve Hood would no longer interfere.  He is damaging the reputation of Crystal Flash and myself in the market place.  I have anguished over why Steve Hood has been this way towards me since I have no history with him.  From the first day he arrived at Crystal Flash I treated him with dignity and respect – took my time to show him different things he needed to know about operating procedures and the like at Crystal Flash.  I have not retaliated towards him in any way for all the negative comments and actions towards me.  I have a solid, long standing track record at Crystal Flash of working in harmony and as a supportive teammate with everyone.  I have never encountered anything of this nature.  The best I can surmise is that he is conducting this campaign of harassment and character assassination to undermine my ability to properly do my job so that I might be changed or terminated and he could assume my position.

That same day, Muncy spoke with Fehsenfeld about her conversation with Jolivette the previous week. After listening to Muncy, Fehsenfeld went to Madden and asked what he knew about Jolivette's complaints. Madden was unaware of Jolivette's latest complaint, but he went to Marra-Wert to gather more information. Marra-Wert showed Madden the email Jolivette had sent to her (though Jolivette had asked her not to do so). After reading the email, Madden set up a meeting with Jolivette for November 11, 2004.

On November 11th, Madden met with Jolivette and Marra-Wert. There was some discussion of Jolivette's recent expressions of unhappiness. The three participants have different opinions as to whether Jolivette was given much of an opportunity to explain his complaints of poor treatment by Hood. However, there is no conflict in the record regarding whether Jolivette spoke of age discrimination or a hostile work environment during that meeting: he did not. There is also no dispute that Madden used the meeting as an opportunity to redistribute the responsibilities in the retail section. This redistribution of responsibility resulted in Jolivette having less authority and Hood considerably more. Jolivette kept his current salary and benefits, but he lost his vice president title and became director of purchasing. He was told he would be reviewed in ninety days. At the same time, Hood was made a member of the management team. He was put at a management level similar to Jolivette, and he no longer reported directly or indirectly to Jolivette. Two other employees who formerly reported to Jolivette began reporting to Hood.

Jolivette received no bonus for 2004, but there is no evidence in the record indicating that anyone in retail received a bonus. It was the third year in a row that the division had suffered losses. As the year ended, the management team at Crystal Flash consisted of CEO Fehsenfeld (age 75), president Madden (age 54), director of administration Debra Baker (age 50), director of human resources Marra-Wert (age 50), office and payroll manager Muncy (age 56), director of accounting David Adams (age 39), director of retail Hood (age 48), and director of purchasing Jolivette (age 55).

January 2005 brought with it the result Jolivette had feared. He was terminated and Hood became the top person on the retail side of the business. In a meeting with Madden and Marra-Wert on January 6, 2005, Jolivette was informed that his position was being eliminated and there was no longer a spot for him at Crystal Flash. His last day of employment with Crystal Flash was January 14, 2005, but he was paid through the end of April. Hood was given the title retail director and reported directly to Madden.

Three months after he was fired, Jolivette filed a charge with the Equal Employment Opportunity Commission complaining of age discrimination. In his charge, he testified that his belief that he was a victim of age discrimination was based in part on statements by Crystal Flash management to the effect that "He's a dinosaur," and "He's old." In his deposition, however, Jolivette denied that either of these things was actually said. Pl. Dep. 233. In his EEOC charge,

Jolivette also said that he had heard Hood tell a prospective vendor or others that Jolivette was "set in his ways" and "had been here too long." Jolivette also said that Madden had said "We need new ideas – to go in a different direction." Plaintiff also claimed in his deposition that he thought Madden's comments to the effect that he did not accept new ideas and was reluctant to change showed evidence of age discrimination. Pl. Dep. 235-38.

*Standard of Review*

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The motion should be granted so long as no rational fact finder could return a verdict in favor of the non-moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's ruling on a motion for summary judgment is akin to that on a motion for a directed verdict. The essential question for the court in both is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. When ruling on the motion, the court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Id.* at 255. If the non-moving party bears the burden of proof on an issue at trial, that party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see also *Silk v. City of*

...

*Chicago,* 194 F.3d 788, 798 (7th Cir. 1999). The moving party need not positively disprove the opponent's case; rather, it may prevail by establishing the lack of evidentiary support for that case. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

*Discussion*

The Age Discrimination in Employment Act (ADEA) bars a covered employer from taking retaliatory action against an employee who complains of prohibited age discrimination, even if the employee's underlying complaint does not actually concern illegal conduct. See 29 U.S.C. § 623(d); *Horwitz v. Board of Education of Avoca School Dist. No. 37,* 260 F.3d 602, 612 (7th Cir. 2001) (affirming summary judgment for employer on ADEA retaliation claim). The ADEA section at issue is known as the "opposition clause." It protects employees who oppose illegal age discrimination in the workplace. See generally Barbara T. Lindemann & David D. Kadue, *Age Discrimination in Employment Law,* Ch. 6 IV (BNA Books 2003). While the conduct complained of need not actually violate the ADEA, the plaintiff must have had a reasonable and good faith belief that it did. *Kempcke v. Monsanto Co.,* 132 F.3d 442, 445 (8th Cir. 1998) (reversing summary judgment for employer where employee benefit plan appeared innocuous but managers had repeatedly referred to "young promotables" and the need to find opportunities for younger employees); see also, *e.g., Nair v. Nicholson,* 464 F.3d 766, 769 (7th Cir. 2006)(to be protected activity under similar Title VII provisions, complaining party need only have an honest and reasonable belief that there has been a violation of the

law); *Horwitz*, 260 F.3d at 612-13 (employee's complaints about age discrimination were protected activity even though employer was entitled to summary judgment on merits of the age discrimination claims).

A plaintiff may prove prohibited retaliation under federal discrimination laws through either the direct method or the indirect burden-shifting method. *Moser v. Indiana Dep't of Corrections*, 406 F.3d 895, 903 (7th Cir. 2005). Jolivette contends there is sufficient evidence to support his claim with either method:

> Under the direct method, a plaintiff must show that "(1) he engaged in statutorily protected activity; (2) he suffered an adverse action taken by the employer; and (3) [there was] a causal connection between the two." *Id.* [*Moser*, 406 F.3d at 903] To prove retaliation under the "indirect method, the plaintiff must establish a prima facie case of retaliation by showing that: (1) he engaged in a statutorily protected activity; (2) he met the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Id.* "If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to present evidence of a non-discriminatory reason for its employment action." *Adusumilli v. City of Chicago*, 164 F.3d 353, 362 (7th Cir. 1998). "If the employer meets its burden, the burden shifts back to the plaintiff to demonstrate that the employer's reason is pretextual." *Moser*, 406 F.3d at 904.

*Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).

Under either approach, Jolivette must show that he engaged in protected activity. He seeks to characterize as protected activity his email to Marra-Wert, which used the terms "age discriminatory" and "hostile work environment." For purposes of summary judgment, the court assumes that Jolivette had an honest

and good faith belief that he was the victim of age discrimination. The undisputed facts show, however, that Jolivette could not have had a *reasonable* belief that he was the victim of age discrimination. Jolivette was not alleging that his employer had engaged in any discriminatory conduct. He was complaining not about the actions of Crystal Flash management but about derogatory comments made by an employee who worked under his supervision, and none of those comments indicated age bias.

Jolivette stated in his email that Hood had made comments to vendors and store personnel that were derogatory and age discriminatory and created a hostile work environment. He described some of the statements that Hood made to vendors and a Crystal Flash store employee. None of those statements in the email could be reasonably interpreted as being age discriminatory or creating a work environment that was hostile based on Jolivette's age. While Jolivette used the terms "age discrimination" and "hostile work environment" to describe the statements and conduct of his subordinate, he has not come forward with any evidence that would support a finding that he had a reasonable belief that he was the victim of unlawful age discrimination. The email shows that Jolivette did not like the fact that Hood was telling people that Jolivette was only an incompetent face at the front of a department that Hood actually ran. When he wrote the email Jolivette thought that Hood was after his job. The court can easily assume that he was. However, even if Hood was actually trying to force Jolivette (a man only seven years older than he was) out of his job, nothing in his comments or in the

rest of the record on summary judgment suggests that it was because of Jolivette's age, so that Jolivette could have believed reasonably that he was a victim of age discrimination.  See, *e.g.*, *Clark County School Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (affirming summary judgment for employer on retaliation claim where employee could not have reasonably believed that single incident created hostile work environment based on sex); *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 890-91 (7th Cir. 2004) (retaliation bar in Title VII "was not designed to 'arm employees with a tactical coercive weapon' under which employees can makes baseless claims simply to 'advance their own retaliatory motives and strategies'"). Jolivette's email was not an indictment against Crystal Flash for age discrimination but a complaint that Steve Hood was not "playing fair" and was undermining Jolivette's authority.  In writing that email, Jolivette could not have had a reasonable belief that he was opposing any action of Crystal Flash that would be illegal under the ADEA.  Consequently, Jolivette's case fails at step one under both of the proof methodologies.

The undisputed facts also show that the retail division was losing money and that Madden believed that costs had to be cut.  Jolivette was the head of a department that had suffered losses three years in a row.  That fact suggests that his claim that he had been performing up to his employer's expectations has little merit.  The court will not dwell on Jolivette's testimony that, as head of that division, he had no responsibility for store profitability.  Even if he did not have that responsibility, Jolivette was already under fire from Madden for other real or

perceived failures, such as the inability to obtain a newly designed coffee cup. The undisputed facts thus show that Madden and Fehsenfeld confronted a situation in which the division was losing money, the head of the division could not manage to secure a new design for something as simple as a coffee cup, and there was clear conflict between the head of the division and the number two person in it. Jolivette concedes that his demotion and termination were not based on age discrimination, and the undisputed facts also show they were not based on any intent to retaliate against him for engaging in any activity protected under the ADEA.

*Conclusion*

Defendant's motion for summary judgment (Document No. 31) is granted. A separate judgment will be entered in favor of defendant and against plaintiff.

So ordered.

Date: August 3, 2007

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Carolyn Ann Clay
HASKIN LAUTER LARUE & GIBBONS
cclay@hlllaw.com

Kenneth E. Lauter
HASKIN LAUTER LARUE & GIBBONS
klauter@hlllaw.com

S. Gregory Zubek
WHITHAM HEBENSTREIT & ZUBEK
sgz@whzlaw.com